FILED
United States Court of Appeals
Tenth Circuit

March 19, 2015

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

FERNANDO PALACIOS,

      Defendant - Appellant.

No. 14-5021
(D.C. No. 4:13-CR-00005-JHP-4)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **GORSUCH**, **SEYMOUR**, and **BACHARACH,** Circuit Judges.

Fernando Palacios pled guilty to maintaining a drug-involved premises in violation of 21 U.S.C. § 856. He appeals his sentence of eighty-seven months, and we affirm.

On December 13, 2012, Tulsa Police Officers executed a search warrant at 2711 E. King Street after an investigation led them to believe the residence was being used as a stash house for a largescale drug-trafficking operation. During

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, or collateral estoppel. It may be cited for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

the search, officers found large quantities of methamphetamine and cocaine, two loaded guns, and drug paraphernalia. Police also located several individuals inside the residence including Ezequiel Perez Cervantes, Jose Luis Hurtado, and Ramiro Aguayo Torres. Although Mr. Palacios rented a room from Mr. Perez at the King Street house and lived there, he was not present during the raid and he was not arrested.[1]

On January 5, 2013, Tulsa Police arrested Mr. Palacios after a traffic stop and subsequent search of his vehicle revealed several small bags of methamphetamine, drug paraphernalia, and a small amount of cash. On January 11, 2013, a grand jury indicted Mr. Perez, Mr. Hurtado, and Mr. Torres on multiple counts, including conspiring to possess with intent to distribute cocaine and methamphetamine, and several drug possession and firearms charges, among others. Mr. Palacios was not charged at that time.[2] He was eventually charged in a four-count third superseding indictment in September 2013 with conspiring to possess and possession with intent to distribute cocaine and methamphetamine, and maintaining the King Street house on or about December 31, 2012, as a drug involved premises.

---

[1] On the same day, Tulsa Police executed a search warrant at a different house that was also being used by Mr. Perez, who police identified as being the head of the drug-trafficking operation.

[2] Mr. Perez, Mr. Hurtado, and Mr. Torres all subsequently pled guilty pursuant to written plea agreements to various charges.

Mr. Palacios pled guilty pursuant to a written plea agreement to count four, knowingly maintaining a drug-involved premises for the purpose of manufacturing or distributing cocaine and methamphetamine, in exchange for the dismissal of all other pending charges at sentencing. In the plea agreement, Mr. Palacios admitted he lived at the King Street house on the day it was raided, he "was aware that other persons were using the house to store and to sell drugs," and he "facilitated and assisted their use of the house for that purpose by receiving money for [Mr.] Perez and turning the money over to him." Rec., vol. I at 73. At his plea colloquy, Mr. Palacios admitted that his actions helped Mr. Perez and others sell drugs at the King Street house. The government and Mr. Palacios stipulated in the plea agreement to a drug quantity amount of between fifty and 200 grams of methamphetamine, recognizing that the district court would not be bound by this amount.

The presentence report (PSR) set forth the total amount of drugs and money recovered during the raid as representing a marijuana equivalency of 1,818.86 kilograms. Based on that quantity of drugs, the PSR calculated a base offense level of 32 for Mr. Palacios. With adjustments for specific offense characteristics including possession of a weapon, a downward adjustment for acceptance of responsibility, and a criminal history category of I, the proposed advisory guideline range was 135 to 168 months. Mr. Palacios filed written objections to the PSR, which he renewed at sentencing. He did not object to the calculation of

the total drug amount.  Instead, Mr. Palacios argued that he should only be held accountable for the stipulated amount of fifty to 200 grams of methamphetamine and not for the actions of others at the house, and that he should not receive a two-level enhancement for possessing a firearm.  The district court addressed and overruled his objections, but it granted his motion for a four-level downward variance.  The court ultimately sentenced Mr. Palacios to eighty-seven months imprisonment to be followed by three years of supervised release.

We review federal sentences for reasonableness, applying a deferential abuse of discretion standard.  *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Lente*, 647 F.3d 1021, 1030 (10th Cir. 2011).  "We review the district court's legal interpretation of the guidelines de novo, and review its findings of fact for clear error, giving due deference to the district courts application of the guidelines to the facts."  *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir. 1998) (citation omitted).  Our review includes "both the reasonableness of the length of the sentence, as well as the method by which the sentence was calculated."  *United States v. Warren*, 737 F.3d 1278, 1283 (10th Cir. 2013).  Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence."  *Gall*, 552 U.S. at 51; *Lente*, 647 F.3d at 1030.  Here, Mr. Palacios challenges only the "method by

which the sentence is calculated," and thus our review is limited to the procedural reasonableness of his sentence. *Lente*, 647 F.3d at 1030 (internal quotation marks omitted).

Mr. Palacios contends the district court erred in overruling his objections to the PSR. The crux of his argument is that the district court violated Fed. R. Crim. P. 32(i)(3)(B), which requires a sentencing court to rule on any disputed portions of the PSR at sentencing, asserting that the court failed to take evidence at the sentencing hearing and therefore "there was simply no evidence before the Court from which it could have overruled Mr. Palacios's objections." Aplt. Br. at 16. Specifically, he argues the court erred in adopting the PSR's drug quantity calculation, which attributed to him the entire amount of drugs seized during the raids. He asserts he never admitted to being part of the underlying drug conspiracy and notes his plea agreement stipulated to a drug quantity of fifty to 200 grams of methamphetamine. He claims the district court should have only held him accountable for the stipulated amount because it "had no other evidence before it as to the quantities of drugs involved in Mr. Palacios's offense conduct."[3] Aplt. Br. at 17. We are not persuaded.

Section 2D1.8(a) of the Guidelines is used to calculate the base offense

---

[3] We read Mr. Palacios's brief as asserting that there was no evidence before the court showing his involvement in the drug conspiracy, not that there was no evidence showing the quantity of drugs found in the raid of the King Street house.

level where a defendant pleads guilty to violating § 856(a)(1). U.S.S.G. § 2D1.8(a) (2013); *United States v. Dickerson*, 195 F.3d 1183, 1189 (10th Cir. 1999). Section 2D1.8(a)(1) states that the "offense level from § 2D1.1 applicable to the underlying controlled substance offense" is utilized in calculating the base offense level. Section 2D1.8(a)(2) sets forth one exception: "[i]f the defendant had no participation in the underlying controlled substance offense other than allowing use of the premises, the offense shall be 4 levels less than the offense level from § 2D1.1 applicable to the underlying controlled substance offense, but not greater than level 26." As the commentary explains:

> Subsection (a)(2) does not apply unless the defendant had no participation in the underlying controlled substance offense other than allowing use of the premises. For example, *subsection (a)(2) would not apply to a defendant who possessed a dangerous weapon in connection with the offense*, a defendant who guarded the cache of controlled substances, a defendant who arranged for the use of the premises for the purpose of facilitating a drug transaction . . . *or a defendant who otherwise assisted in the commission of the underlying controlled substance offense*.

U.S.S.G. § 2D1.8 app. n.1 (2013) (emphasis added).

At sentencing, the district court specifically addressed and overruled Mr. Palacios's objection concerning the amount of drugs used in his base offense calculation. It held that the base offense level of 32, calculated under § 2D1.1 from the total quantity of drugs found in the raid, was appropriate because Mr. Palacios "not only allowed the use of the premises for the underlying controlled substance offense, but he additionally participated in the underlying offense by

-6-

possessing a dangerous weapon and by facilitating and assisting the co-defendants' use of the drug-involved premises by receiving money for the drugs." Rec., vol. II at 37. Thus, the district court viewed the "underlying controlled substance offense" in § 2D1.8(a)(1) as including the total quantity of drugs found in the raid of the King Street house. It adopted as its findings the amount of drugs set forth in the PSR.

The main problem for Mr. Palacios in his effort to limit his responsibility for the amount of drugs found in the raid of the King Street house is the nature of the offense to which he pled guilty. His plea agreement sets forth the elements the United States was required to prove to convict him under 21 U.S.C. § 856: "a. The defendant *used a place* 2711 E. King Street *for the purpose of* manufacturing or distributing a controlled substance; and b. The defendant knew that the place was used for such a purpose." Rec., vol. I at 72 (emphasis added). Mr. Palacios specifically admitted he was guilty of the described conduct.

In *United States v. Verners*, 53 F.3d 291 (10th Cir. 1995), we explained the nature of a § 856(a) crime. First, with respect to the requirement that a defendant use or maintain the drug house, we said: "Where the defendant lives in the house, this element is normally easily proved." *Id.* at 296. Second, we addressed "the more complex question" of the requirement that the house be maintained "for the purpose of" manufacturing or distributing drugs. *Id.* We relied on the explanation set forth in *United States v. Chen*, 913 F.2d 183, 189-90 (5th Cir.

1990), where the court held "that 'purpose' was synonymous with 'objective,' 'intention,' and 'aim.' Furthermore, to be convicted under 856(a)(1), the defendant must personally have the 'specific purpose'; it is not 'sufficient for others to possess it.'" *Verners*, 53 F.3d at 296.

Thus, by pleading guilty to maintaining the King Street house as a drug house, Mr. Palacios was admitting that it was *his* intention that the drugs be manufactured or distributed there. Furthermore, he admitted facilitating such distribution by accepting drug money for Mr. Perez on one occasion. And, significantly, *see infra*, Mr. Palacios left his loaded gun at the premises, which the police found near large quantities of drugs during the raid on the King Street house. As we held in *Dickerson* with respect to a violation of § 856(a):

> *By its very nature, the offense of conviction involved the participation of other persons.* More specifically, in order to violate [the statute], *Dickerson had to provide the house or building and other parties had to use the house to engage in drug trafficking* activity. *For purposes of sentencing, then, Dickerson can be held accountable for any reasonably foreseeable activities engaged in by the parties using his house for drug trafficking activities. . . . See* U.S.S.G. § 1B1.3(a)(1)(B) (in a case involving jointly undertaken criminal activity, relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity").

195 F.3d at 1188-89 (emphasis added) (some citations omitted). While Mr. Palacios claims he never admitted to being part of a jointly undertaken criminal activity and thus cannot be held responsible for the entire amount of drugs found during the raid, our decision in *Dickerson* makes clear that when one maintains a

-8-

drug house, he becomes responsible for the reasonably foreseeable activities of those who use the house for the distribution of drugs.

As the district court held, by knowingly facilitating use of his residence for the manufacturing and distribution of drugs on or about December 13, 2012, Mr. Palacios became responsible for the activities of his landlord and others using the house for that purpose on the day of the raid. Accordingly, the court properly overruled Mr. Palacios' objection to the drug quantity calculation and did not err in determining the base offense level as it did.

Mr. Palacios also contends the district court erred in applying a two-level enhancement for possessing a firearm. He argues that he never admitted "possessing a firearm in relation to the offense for which he pleaded guilty," and that there is no evidence suggesting he "possessed a firearm during his offense of conviction." Aplt. Br. at 22. Although Mr. Palacios admitted to legally owning one of the firearms recovered from the King Street house, he asserts that the gun was not related to his offense of conviction because he was nowhere near the house at the time of the raid, and that there is no evidence the gun was anywhere nearby on the day he accepted drug money at the house for Mr. Perez.

Section 2D1.1(b)(1) provides that "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." The commentary to the guideline states that the weapon possession enhancement "reflects the increased danger of violence when drug traffickers possess weapons," and that the "enhancement

should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 app. n.11(A) (2013).

The district court addressed and overruled Mr. Palacios's objection to the firearm enhancement. It noted that "the application standard for possession under this guideline has to do with possession by proximity," and that "[t]o support this proximity relationship, the government need only show that the weapon was found in the same location where drugs or drug paraphernalia are stored." Rec., vol. II at 39. The court held the two-level enhancement appropriate because the guns were found "in close proximity to a large amount of cocaine and methamphetamine," in the King Street house and a preponderance of the evidence suggested Mr. Palacios "had control and/or possession of the firearm." *Id.* at 39-40.

"[W]e have held that the government bears the initial burden of proving possession by a preponderance of the evidence, and proof of possession may be established by showing mere proximity to the offense." *Dickerson*, 195 F.3d at 1188 (citing *United States v. Vaziri*, 164 F.3d 556, 568 (10th Cir. 1999); *United States v. Roberts*, 980 F.2d 645, 647 (10th Cir. 1992)). "If the government meets its initial burden, the defendant must show that it was 'clearly improbable' that the weapon was connected to the offense." *United States v. Thomas*, 749 F.3d 1302, 1317 (10th Cir. 2014). In *Thomas*, we upheld the district court's

application of the two-level enhancement for possession of a firearm under § 2D1.1(b)(1). *Id.* Mr. Thomas argued that the government failed to show the gun "was connected to the offense." *Id.* We noted "[t]he government met its initial burden" where the "gun was found in a residence with drugs, scales, plastic bags and other drug paraphernalia." *Id.* We explained that "[t]he proximity of the gun and drug evidence sufficed for the government's threshold burden," and therefore upheld the firearm enhancement "[b]ecause Mr. Thomas" did not show "a 'clear improbability' that the weapon was connected to the offense." *Id.*

Nor has Mr. Palacios shown a clear improbability that the firearm he legally possessed was connected to the offense. The gun here was located in the King Street House near large amounts of drugs and was available for use by the co-defendants planning to distribute drugs at the house that day. While Mr. Palacios would like to ignore this fact, it is not improbable that the loaded gun was available to facilitate the intended drug sale that day. It is irrelevant that Mr. Palacios was not at the house when the gun was found in proximity to the drugs. *See Dickerson*, 195 F.3d at 1186, 1188-89 (having pled guilty to maintaining a drug house, Dickerson was held responsible for the guns found there when he "failed to present any evidence demonstrating the firearms were not connected with the drug trafficking activities that occurred in his house"). The district court

-11-

did not err in overruling Mr. Palacios's objection and applying a two-level enhancement under § 2D1.1(b)(1).

We affirm.

ENTERED FOR THE COURT


Stephanie K. Seymour
Circuit Judge